FILED
2021 Feb-24  PM 12:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **AXEL MANUEL ROBLES LOPEZ,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CIVIL ACTION** |
| **ANDREW M. SAUL,** | ) | **NO. 2:19-CV-01222-KOB** |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

## MEMORANDUM OPINION

## I.      INTRODUCTION

On November 30, 2015, the claimant, Axel Lopez, protectively filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning April 1, 2015, because of depression, bipolar disorder, and posttraumatic stress disorder (PTSD). The Commissioner denied the claimant's application for disability insurance benefits on September 24, 2018, and the claimant filed a timely request for a hearing before an Administrative Law Judge (ALJ). The ALJ held a hearing on June 26, 2018. (R. 18, 36).

The ALJ found that the claimant was not disabled in a decision dated September 24, 2018. On that same day, the claimant appealed to the Appeals Council, but it denied the claimant's request for review on June 10, 2019.  (R. 1, 2, 18).  Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration.

The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court AFFIRMS

the decision of the Commissioner.

## II.     ISSUE PRESENTED

Whether the ALJ properly evaluated the claimant's subject allegations regarding the limiting effects of his mental impairments.

## III.     STANDARD OF REVIEW

The court's scope of review is limited to determining (1) whether substantial evidence exists in the record as a whole to support the findings of the Commissioner, and (2) whether the ALJ applied the correct legal standards. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker* F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

This court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgement for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of

certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV.   LEGAL STANDARD

### *Subjective Pain Testimony*

In evaluating pain and other subjective complaints regarding the limiting effects of mental impairments, the Commissioner must consider whether the claimant presented "'evidence of an underlying medical condition' and either 'objective medical evidence that confirms the severity of the alleged pain [or other subjective symptoms] arising from that condition' or 'that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain [or other subjective symptoms].'" *Taylor v. Acting Comm'r of Soc. Sec. Admin.*, No. 18-11978, 2019 WL 581548, at *2 (11th Cir. Feb. 13, 2019) (quoting *Dyer*, 395 F.3d at 1210); *see also* 20 C.F.R. § 404.1529; SSR 16-3p.

When evaluating a claimant's subjective symptoms, the ALJ must consider all available evidence, including objective medical evidence and opinions; the claimant's daily activities; the type, dosage, and effectiveness of medications taken to alleviate the symptoms; and factors that precipitate and aggravate the symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 16-3p. "Subjective pain testimony that is supported by objective medical evidence of a condition that can reasonably be expected to produce the symptoms of which the claimant complains is itself sufficient to sustain a finding of disability." *Taylor v. Colvin*, No. 2:15-CV-1925-VEH, 2016 WL 6610442, at *4 (N.D.

Ala. Nov. 9, 2016) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)) (internal quotations omitted).

If the ALJ decides to discredit the claimant's testimony as to his subjective symptoms, she must "'clearly articulate explicit and adequate reasons' for doing so." *Taylor*, 2019 WL 581548, at *2 (quoting *Dyer*, 395 F.3d at 1210). The ALJ's failure to articulate reasons for discrediting the claimant's testimony is reversible error. *Ellis v. Soc. Sec. Admin., Comm'r*, No. 4:18-cv-00010-SGC, 2019 WL 1776805, at *5 (N.D. Ala. Apr. 23, 2019).

Also, substantial evidence must support the ALJ's findings regarding the limiting effects of the claimant's symptoms. *Meehan v. Comm'r of Soc. Sec.*, No. 18-14924, 2019 WL 2417642, at *3 (11th Cir. Jun. 10, 2019); *Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987). The ALJ's determination must contain explicit reasons for the weight given to a claimant's individual symptoms, be consistent with and supported by the evidence, and be clearly articulated so the claimant and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms. SSR 16-3p. A reviewing court will not disturb a clearly articulated credibility finding that has supporting substantial evidence in the record. *Rose v. Berryhill*, No. 6:18-cv-00030-LCB, 2019 WL 2514936, at *9 (N.D. Ala. Jun. 18, 2019) (citing *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995)).

## V.     FACTS

The claimant was thirty years old at the time of the ALJ hearing; he had "failed high school" but obtained a GED in 2008 and completed one semester of college. His past work includes as an equipment cleaner, dietary aid, parts assembler, and kitchen helper.  He claims disability because of depression, bipolar disorder, and PTSD.

### *Mental Impairments*

On October 15, 2013, the claimant saw counselor Kathryne S. Shapard at Centerstone

4

clinical intake assessment. The records show that the claimant previously sought counseling at Centerstone four times in 2011, once in 2012, and once in 2013. The claimant reported that he had a history of drug and alcohol use; had a history of PTSD and depression; came from a broken home where he endured physical and sexual abuse as a child; and "took to the streets" after living with his dad. (R. 449-50).

The claimant's symptoms included anhedonia, poor sleep, poor appetite, irritability, and some passive thoughts about suicide. The claimant said his primary care physician prescribed Celexa, a depression medication, but the claimant found it ineffective. Also, the claimant said he was unemployed since 2010 until his recent job in the dietary department of a hospital. Additionally, the claimant said he drank beer daily; smoked weed occasionally; and suffered from gallstones, asthma, and shoulder and knee injuries. (R. 450).

The claimant's mental status exam showed that the claimant had appropriate behavior and appearance; normal thought processes; disturbances in his appetite, energy, pleasure, and sleep; an anxious and depressed mood; organized speech; normal thought content; good motivation for treatment; fair insight; and fair judgment.  The claimant's suicide rating assessment revealed the claimant wished he was not alive but had no active intent to commit suicide.  Ms. Shapard scheduled the claimant for mental health treatment once every two to four weeks.  (R. 451--53).

On October 31, 2013, the claimant returned to Centerstone for counseling with Ms. Shapard to address his substance abuse and set goals for treatment. Regarding the substance abuse, the claimant said, "I don't want this to be a problem," but showed no improvement in his goal to decrease the amount and frequency of his drug use. (R. 462).

At the Centerstone Care Plan assessment session on November 1, 2013, the claimant indicated that he had worked 30 hours for pay over the previous seven days and that over the previous thirty days he drank no more than five alcoholic drinks and used no drugs to get high.  The

claimant's care plan also noted a mild impairment because of the claimant's past substance abuse. The claimant set goals to decrease his substance intake and develop coping skills. The claimant's suicide screening indicated that he had no intent to commit suicide since his last visit. (R. 474-75).

At the November 1 session, the claimant said his strengths were his "survival skills;" his needs were "whatever…I can't decide…maybe help to feel better;" his abilities included his bowling; and his preferences included late appointments.  When asked about his goals, the claimant said, "I don't want to be so irritable." The claimant's care plan noted moderate functional limitations in his emotional/behavior health and the need for frequent professional intervention. The claimant's diagnoses included Major Depressive Disorder.  (R. 474-75).

Laura Dotson, a Centerstone clinician with a master's degree in nursing, performed a psychiatric evaluation on the claimant on November 26, 2013. The claimant said that being around other people helped his mood, but "felt like a waste of time." The claimant reported having trouble sleeping because his "mind won't shut down." He noted that he previously applied for disability benefits for his shoulder pain, but that he took a job in August of 2013 because his attorney "backed out just before the hearing." The claimant said he consumed one beer a day. (R. 464).

The claimant's mental status exam at the November 26 evaluation showed that the claimant had an appropriate appearance, dysphoric mood, appropriate affect, normal speech, organized/logical thought process, fair insight, intact judgment, average intelligence, and no suicidal intent. The claimant's diagnoses indicated that he primarily suffered from Major Depressive Disorder, but also struggled with alcohol abuse.  His Global Assessment of Functioning (GAF) score ranged from 41 to 55, indicating moderate limitations.  The claimant admitted that he did not take his Celexa on a regular bases and started Prozac this visit to treat his depression. (R. 467-68).

On December 4, 2013, the claimant returned to Ms. Shapard at Centerstone for individual

counseling. The claimant said that he had not recently engaged in substance abuse and quit a job he "hated" the day before but wanted a replacement job.  Ms. Shapard's notes indicate that the claimant presented himself as "guarded"; asked appropriate questions about his symptoms and medications; and showed no major obstacles to obtaining his treatment goals. (R. 460).

After the claimant failed to show up for his appointments at Centerstone on January 22, 2014, and February 13, 2014, the claimant's services at Centerstone were discontinued because of a lapse in service. (R. 455, 456, 471).

Dr. Felix Adetunji at Tristar Skyline Madison Hospital admitted the claimant for suicidal ideations on April 3, 2015. The claimant said he was having ideations of cutting himself or driving into something.  The claimant's physical examination showed that the claimant was awake, alert, very tense, and in no medical distress.  The claimant's psychiatric evaluation during his hospital stay indicated the claimant was "increasingly depressed"; struggled with suicidal ideations; and had anger issues that caused him to quit several jobs to prevent hurting his boss or coworkers.  (R. 489-491).

The hospital notes indicate that the claimant's "long history of depressive symptoms" began after he watched his mother attempt suicide via a drug overdose. The claimant said his depression comes and goes and is associated with excessive sleep; decreased appetite; isolative behavior; crying spells; lack of energy; low motivation; and lack of interest or pleasure in activities that used to be pleasurable. The claimant described his mood as hopeless, worthless, and helpless; said he wished he were dead; and indicated that he had attempted suicide once by putting a knife to his throat while arguing with his wife. The claimant noted his stressors include his pending court date for back child support, unemployment, and worsening depression. (R. 491).

Also, the evaluation notes say the claimant reported occasional, abbreviated periods of elevated mood. He said he experiences such feelings when he gets a new job and does not have

overt manic symptoms. The claimant reported a long history of poor anger control that caused him to throw things; hit walls; kick doors; break things; and punch holes in the walls. However, the claimant denied any history of physical altercations with others and said he removes himself before altercations become physical. The claimant said he quit four jobs that year alone because of his anger issues. (R. 491-92).

The evaluation notes discuss the claimant's alcohol and drug history. The claimant started drinking around the age of 13 but said alcohol had never been a problem for him as he only drank socially and that the most alcohol he drank in a day was about four or five beers. Also, the claimant said he would use cannabis to cool his anger and that one "joint" could last him up to one month. The claimant's urine test during his hospital stay was negative for drugs and alcohol, and the claimant said drugs and alcohol had never been problems for him because he watched his mother abuse them. (R. 492).

The claimant's mental status examination during his hospitalization revealed that he had a dysphoric mood; no perceptual disturbances; spontaneous and normal speech; logical and goal-directed thought process; thought content centered around his worsening depression; an alert and oriented mind; good immediate, recent, and remote memory; fair concentration; average intelligence and fund of knowledge; poor judgment; limited insight; questionable reliability; poor impulse control; and thoughts of self-harm and suicidal ideations. (R. 492-93).

Dr. Adetunji's diagnostic impression included Major Depressive Disorder, recurrent, severe without psychotic features; rule out Bipolar Disorder; PTSD; rule out Impulse Control Disorder; rule out alcohol abuse; and rule out cannabis abuse. Dr. Adetunji noted that the claimant had severe, enduring psychosocial stressors; economic problems; problems with his primary support group; problems related to the social environment; and problems related to interaction with the legal system. The claimant said his strengths included his place to live, his independence in

activities of daily living, and his employability. However, the claimant said his weaknesses included his poor coping skills and poor insight into his problems. (R. 493).

The claimant admitted to Dr. Adetunji that he had not been taking his prescribed Celexa. During his hospital stay, Dr. Adetunji prescribed the claimant Lithium, Wellbutrin, and Trazodone. The claimant remained at Skyline-Madison hospital for six days until April 9, 2015, when he was discharged with a "fair" prognosis with treatment. (R. 488, 492-93).

On April 23, 2015, the claimant sought treatment with Licensed Professional Counselor Pamela Hiers with Murfreesboro Community Mental Health Center for a psychiatric diagnostic evaluation. The claimant said he did not like Centerstone because he had to go to therapy to get his medications, and he "couldn't afford the copay to do both."

The claimant told LPC Hiers that he had been unemployed since March of 2015; he left four jobs in the past year; and his precipitating events included losing his house, incarceration for non-support payments, and financial stress.  The claimant said that, after his birth in Puerto Rico, his father took him and his four siblings to America and "dropped" them in Alabama with a woman who did not want to care for them. The claimant was in his second marriage; has a wife who worked full-time; has a one-year-old daughter and an older step-daughter living at home; and joined a bowling league for leisure. (R. 497-99).

LPC Hiers' mental status exam of the claimant during the April 23 visit noted that the claimant appeared casual; had normal speech; no orientation issues; appropriate affect; appropriate behavior; normal thought content/perceptions; organized thought processes; and dysthymic mood. She assessed that the claimant primarily suffered from Bipolar Disorder but secondarily suffered from chronic PTSD. The claimant indicated that his strengths were his supportive wife and place to live; that he needed management to control his bipolar and PTSD disorders; that he was willing to seek treatment; and that he preferred medication management. (R. 504-508).

9

The claimant first saw psychiatrist Dr. Philip A. Grossi on December 1, 2015. The claimant said his wife worked "short contract work around the country," so he had no consistent follow-up for mental health treatment. The claimant said, since he was 24 years old, he experienced at least ten episodes of depression that lasted for periods longer than two weeks. The claimant characterized his depression as feeling sad, gloomy, pessimistic, hopeless, helpless, worthless, fatigued, exhausted, apathetic, tense, guilty, and suicidal.  He also described his low libido; tendency to withdraw; decreased concentration; oversleeping; and inability to relax. However, the claimant noted he experienced several hypomanic episodes after positive changes in his life, like securing a job. During these episodes, the claimant said he was more talkative and outgoing than usual, experienced rapid thinking, felt a decreased need for sleep, had inflated self-esteem, and was more productive.  Dr. Grossi continued the claimant on his current medications that included lithium, Trazadone, Risperidone, and Bupropion and told him to return in two months.  (R. 512).

On January 11, 2016, the claimant completed a Disability Report form at the request of the Social Security Administration. The claimant said his Bipolar Disorder, PTSD, and depression limited his ability to work but did not cause him pain or other symptoms. The claimant reported that he stopped working on April 1, 2015 because of his conditions but indicated also that his conditions did *not* "cause [him] to make changes in his work activity."  The claimant noted his medications included Celexa prescribed by Centerstone for his PTSD and depression, and Lithium, Risperidone, Trazadone, and Bupropion prescribed by Skyline-Madison Hospital for his Bipolar Disorder. (R. 352-59).

The claimant's January 31, 2016 "Function Report-Adult" indicated that he lived in an apartment with his family.  From the time the claimant wakes up until he goes to bed, the claimant said he, with his wife's help, does housework; watches television; and takes care of his kids by cooking for them and changing his youngest child's diaper. (R. 369-77).

The claimant said he suffered from bipolar disorder his whole life, but he did not pursue treatment until April 2015.  His bipolar disorder occasionally affects his sleep. However, the claimant reported no problems with self-care; needs no reminders to take care of his personal needs; but needs an alarm to remind him to take his medicine. (R. 370-71).

Also, the claimant said he spends thirty minutes a day preparing his meals and that his cooking habits remained the same since the onset of his disability. Regarding house and yard work, the claimant said he needs encouragement to take out the garbage and do the dishes weekly. He goes outside every day; drives when he needs to go somewhere; and shops online and in stores about an hour each week for food and household needs. (R. 371-72).

Additionally, the claimant said his ability to handle money had not changed since the onset of his disability as he could pay bills, handle a savings account, count change, and use a checkbook/money orders. The claimant noted no change in his hobbies and interests since his disability began as he continued to bowl, play video games, and watch television.  He spends time with others when he goes bowling every week, but he has problems getting along with others because he is "often triggered" and his anger escalates quickly.  (R. 372-74).

The claimant said his conditions affect his ability to concentrate; complete tasks; follow instructions; and get along with others. Specifically, the claimant said that, once he is angered, he has trouble focusing. However, the claimant said he could pay attention for a "long time" and finishes what he starts. Also, the claimant said he could follow spoken and written instructions and gets along with authority figures "pretty well." (R. 374-75).

The claimant reported that he had never been fired because of his inability to get along with others because he would always leave before his supervisors could fire him. Also, the claimant noted that, while he could somewhat handle changes in his routine, he did not handle stress well. The claimant also reported that he experienced unusual behavior or fear because of paranoia and

11

that none of his medications caused any side effects. (R. 375-76).

The claimant's friend, David Aaron Busby, completed a "Function Report-Third Party" on February 2, 2016. Mr. Busby indicated that he observed the claimant's mood and personality change "day to day or even minute by minute." Mr. Busby said that the claimant would be fine on some days but would "take your head off for asking a simple question" on other days. (R. 382).

Mr. Busby said he has known the claimant for five years and would see the claimant four or five times a week until the claimant moved. Mr. Busby said the claimant kept to himself and that he was the only one who could get the claimant out of the house; the claimant has a wife, step-daughter, an almost-two-year-old daughter; he mostly takes care of his younger daughter; and the claimant's wife and step-daughter "help with everything." (R. 383).

Mr. Busby noted that the claimant repeatedly made efforts to hold a job; has difficulty sleeping when his depression hit; gets progressively worse the longer the claimant's depression spells would last; "wear[s] clothes for days or weeks and [does] not shower or shave" when he feels down; and needs regular reminders to take his medication. (R. 383).

Mr. Busby said the claimant could "do anything" when his mind was right but was usually depressed and unable to do the simplest tasks. Mr. Busby said the claimant rarely went outside; shopped in stores and online for groceries bowling equipment, video games, and table-top games "as quickly as he [could]"; could not handle a savings account because he poorly managed his money; but could pay bills, count change, and use a checkbook/money orders. (R. 384-86).

Regarding the claimant's hobbies, interests, and social activities, Mr. Busby noted that most of the hours that the claimant was awake, he either bowled, played video or table-top games, or watched television.  Before the claimant moved, they would bowl together five times a week. Mr. Busby expressed concern that the claimant never left his apartment after moving and said that, although the claimant does not have to have someone with him, it usually keeps him calm. Mr.

Busby said the claimant is difficult to connect with because he pushes others away. (R. 386).

Mr. Busby indicated that the claimant's mental disabilities affect his memory, ability to complete tasks, concentration, understanding, ability to follow instructions, and ability to get along with others. Mr. Busby said the claimant's ability to perform "varies with his state of mind." Mr. Busby said the claimant "snaps quite easily under stress" and left a lot of his jobs because he wanted to avoid physical altercations. Mr. Busby noticed the claimant's ability to adjust to routine changes depends on his mental state of mind. (R. 387-88).

On February 10, 2016, the claimant returned to Dr. Grossi for a follow-up visit.  The claimant reported that he felt "very well" overall and was the most stable he had been in his adult life. Dr. Grossi's notes from the April 5, 2016 visit indicate that the claimant was doing "quite nicely," but the claimant expressed discouragement about the cost of living in the Bay Area. The claimant said he and his wife desired to move back to the East, where the cost of living was lower. (R. 513).

At the request of the Social Security Administration, the claimant saw Dr. Janine Marinos for a psychological evaluation on April 6, 2016. The claimant drove himself to the appointment and arrived on time. The claimant stated that he was applying for disability benefits because of his 2015 psychiatric hospitalization and Bipolar Disorder. The claimant said that he quit his last job as a forklift operator after just three weeks right before his psychiatric admission in 2015. (R. 516-19).

The claimant reported to Dr. Marinos that his suicidal triggers occur when he has "too much going on" and has a hard time at work; that he was uncertain about the stability of his wife's job; that he feared losing his house; and that he feared facing possible jail time for not paying his child support. (R. 516-19).

The claimant's mental status examination showed that the claimant was pleasant and well-nourished; casually dressed and groomed; was fully alert and oriented; repeated a maximum of four

digits forwards and four digits backward; had fluent, clear, and normal rate of speech; had an appropriate affect; had no suicidal ideations; had linear and goal-directed thinking; reported paranoia; said he felt people were against him and "out to get [him];" and had fair insight and judgment. The claimant reported that his medications helped "for the most part," but they did not keep him from losing his patience with his twelve-year-old child. (R. 516-19).

Dr. Marinos administered a set of WAIS-IV subtests on the claimant to test a variety of abilities. The results showed that the claimant had average verbal reasoning/abstraction abilities; average auditory attention/working memory; average nonverbal conceptual reasoning, verbal expression/knowledge, and general fund of knowledge; average acquired knowledge and verbal reasoning; average auditory attention; mild impairments in delayed and immediate auditory memory; and average immediate and delayed visual memory. Also, the claimant had an IQ of 96, that indicated he had average general intelligence. (R. 518).

Dr. Marino noted that the claimant could understand and carry out simple job instructions; may have moderate difficulty maintaining concentration over a normal workday and coping with the stress of a job; and might have difficulty getting along with others at work even though he acted appropriately at the appointment. Dr. Marino concluded the claimant could handle his money if he received disability benefits.

At the request of the Disability Determination Service, Dr. Brady Dalton, Psy.D., reviewed the claimant's record and concluded that the claimant had no marked pathology or functional/cognitive impairments based on the claimant's limited psychological history, independence in adaptive functioning, mental status, and psychological test profile.  Dr. Dalton stated that the claimant's subjective allegations regarding the limiting effects of his symptoms were inconsistent with the evidence in the record, including the claimant's activities of daily living and his medication treatment. (R. 79).

Dr. Dalton opined that the claimant could carry out simple and complex work instructions; follow simple work-like procedures; make simple work-related decisions; sustain attention throughout extended periods of time (up to two hours at a time); perform at a consistent pace if engaged in a simple to semi-skilled task; and maintain a regular schedule. He concluded that the claimant would work best in a setting without sustained contact with the public; could work in proximity with others but not on joint or shared tasks; and could handle occasional supervisory contact.  Based on the claimant's RFC, education, and age, Dr. Dalton opined that the claimant could adjust to other work and was "not disabled."  (R. 80-83).

At the request of the Social Security Administration, the claimant completed a drug and alcohol use questionnaire on June 15, 2016. The claimant said he used no alcohol or drugs; his daily activities included cooking and chores; and he avoided being around people as much as possible. (R. 413, 415).

Also, at the request of the Social Security Administration, psychiatrist Dr. Robert Estock reviewed the claimant's records on June 30, 2016 and opined that the claimant's subjective allegations regarding his mental limitations were inconsistent with the medical record and only partially credible.  Dr. Estock opined that the claimant could understand, remember, and complete short, simple, 1-to-2 step tasks, but not longer or more detailed ones; could learn and remember a simple work routine if provided sufficient rehearsal; could follow simple directions to find locations and complete tasks; could maintain attention sufficiently to complete simple, 1-to-2 step tasks for periods of at least two hours; needs a well-spaced work setting; could tolerate non-intense interaction with members of the public; could ask questions and request assistance; could tolerate casual, non-intense interaction with coworkers and supervisors; would perform best with a small number of familiar coworkers; could tolerate supportive and nonthreatening criticism; could work in an environment where changes are infrequent and gradual; could maintain basic awareness of

15

safety issues in the workplace; and could use public transportation to get to work.  Dr. Estock concluded that the claimant could adjust to other work and was "not disabled." (R. 96-101).

On September 22, 2016, the claimant saw Nurse Practitioner Melissa C. Karrh at Integrated Behavioral Health for supportive psychotherapy to treat the claimant's bipolar disorder and PTSD. The claimant's symptoms included distinct periods of persistently elevated, expansive, or irritable mood; decreased need for sleep; constant flight of ideas; racing thoughts; and distractibility. The claimant's mental status examination showed good eye contact; normal speech; intact thought associations; dichotomous thought process; poor attention/concentration; an intact fund of knowledge; depressed/anxious mood; and no suicidal ideations. (R. 524-25).

The claimant returned to NP Karrh on October 14, 2016 for a follow-up visit.  NP Karrh's notes indicated that, since the claimant's last visit, he struggled with stressors affecting his performance and social interactions and had occasional agitation issues. But the claimant noted that he experienced good sleep most nights; had good energy levels; and had no extreme mood variations. At his November 18, 2016 visit with NP Karrh, the claimant had minimal improvement in his symptoms and his mental status exam revealed dichotomous thought process; intact thought associations; paranoid perception; poor judgment; impaired insight; intact memory; poor attention/concentration; intact fund of knowledge; depressed and anxious mood/affect; and no suicidal ideations. (R. 521, 562-64).

The claimant went to Madison Hospital in Huntsville on January 9, 2017, complaining that his medications were not working and that he was experiencing suicidal thoughts, anger, anxiety, and depression over the previous two weeks. The records describe the claimant as tense, anxious, and depressed, with adequate intelligence, insight, and judgment. After a two-day hospital stay, Dr. Trevor Linsey instructed the claimant to exercise and get some sleep and indicated that a psychiatrist would follow up with the claimant. (R. 529-31).

The claimant returned to NP Karrh on January 18, 2017. The claimant reported that after his hospital stay the previous week, his sleep improved; his energy was good; his concentration improved; but his motivation was poor.  At his return appointments on March 14, 2017 and May 5, 2017, the claimant reported he had a good mood and said his paranoia did not affect him.  (R. 559-60, 565-66, 568-69).

On August 21, 2017, the claimant returned to Integrated Behavioral Health but saw Nurse Practitioner Thomas Sargent for treatment of his Bipolar Disorder, anxiety, PTSD, and insomnia. The claimant reported trauma-related thoughts and said he had trouble concentrating and sleeping. The claimant's mental status exam indicated that the claimant had good eye contact; normal speech; logical/coherent thought process; intact thought associations; perception within normal limits; intact judgment; good insight; intact memory; good attention/concentration; intact fund of knowledge; irritable and depressed mood/affect; cooperative behavior; and appropriate thought content. (R. 579-81).

The claimant returned to NP Sargent on October 23, 2017 and reported that, since the claimant's last visit, "I just live life everyday counting down until 10 o'clock so I can take my medicine and go to sleep." On a scale of one to ten with ten being the worst, the claimant rated his recent depression at a five and anxiety at a seven. The claimant said his anxiety was affecting his eating, but his young daughter kept him from falling into a deep depression. The claimant reported improved sleep, and the mental status exam was consistent with his previous visit. (R. 575-77).

At his return visit with NP Sargent on January 22, 2018, the claimant reported that his current mental status was "not good." The claimant said his sleep had been okay but his other symptoms, such as irritability, low mood, urges to cry, decreased motivation, and anxiety, were prevalent. However, the claimant's mental status exam noted good attention/concentration; logical/coherent thought processes; and irritable and pleasant mood at times. (R. 569-71).

On March 23, 2018, the claimant told NP Sargent that "The paranoia is getting the best of me." The claimant reported an increase in irritability and depression, manageable anxiety, but decreased sleep quality. The claimant's mental status exam noted that the claimant had "indifferent/restrict mood/affect"; perception within normal limits; logical/coherent thought process; impaired insight; impaired judgment; and good attention/concentration. (R. 610-612).

At his July 7, 2018 follow-up visit with NP Sargent, the claimant said he had his court hearing for his Social Security benefits; his mood was "alright" but endorsed some residual irritability; his sleep was fair; and his appetite was adequate. NP Sargent noted that the claimant had no symptoms of anhedonia, low energy, suicidal intent, panic, obsessions, compulsions, mania, paranoia, or memory difficulties during the visit. The claimant's mental status examination showed that the claimant had low, monotonous speech; "alright"/flat mood; appropriate thought content; logical/coherent thought process; intact associations; impaired insight and judgment; good attention/concentration; intact recent and remote memory; and no suicidal intent. The claimant said his symptoms were manageable and that he responded well to supportive psychotherapy treatment. (R. 618-20).

After the ALJ had rendered her opinion on September 24, 2018, NP Sargent wrote a letter dated October 9, 2019 describing the claimant's disability. NP Sargent said that the claimant's condition constantly fluctuated over the past year, and the claimant never sustained "manageable symptoms for an adequate amount of time." NP Sargent noted that the claimant endorsed symptoms of depression, anxiety, insomnia, and irritability during his most recent appointment and said the claimant would likely be unable to "perform efficiently in the workplace." NP Sargent said the claimant's struggle to adapt to change and tendency to become overwhelmed and agitated in social settings would likely cause the claimant "further harm" if he got a job. NP Sargent concluded that the claimant met the criteria for long-term disability because of his mental illness.

(R. 12).

*The ALJ Hearing*

The ALJ hearing took place on June 26, 2018. The claimant testified that he lived with his wife and three children; attained a GED; completed one semester of college; and has no income other than his wife's income.  (R. 36, 40, 44).

The claimant testified that the amount he drives "depends on what's necessary"; that he drives every Monday to go bowling and every other Wednesday to take his daughter to the doctor for speech therapy; and that he drove on that day to the hearing. (R. 42).

He drove a forklift at his last job before he was hospitalized in April 2015. The claimant testified that he was hired for that job with no training and told to go to work. Then, he was pulled into his supervisor's office and told, "You're not doing your job right." The claimant said he tried to explain that he was not trained, but his supervisor said he would fire him if he did not improve. He testified that he left that job because he "felt threatened."  The claimant testified "that has happened with pretty much all my jobs." He mentioned that paranoia is a side effect of bipolar disorder, and he "get[s] paranoid about everything." (R. 44, 54).

When asked about his ability to focus or concentrate, the claimant said that, when he starts a job, he is "okay starting out," but, as weeks go by, he gets paranoid and begins to have problems with his coworkers or supervisors that make him run away. The claimant said he tried confrontation instead of running away but that his anger gets out of hand, and then he just ends up running away angry. (R. 52-53).

The claimant testified that he was sexually abused as a child and has problems with those recurring memories. He stated that his PTSD makes his depression worse such that he cannot leave his room for periods lasting hours or days. (R. 52).

He said his depression causes him to miss work at times. The claimant said, at one point, he

had a job where he would miss at least one day a week. However, the claimant said he did not have problems remembering what he was supposed to do while at a job. (R. 54-55).

He stated that he could not recall if he had ever lashed out at a supervisor, but he experienced problems getting along with coworkers and has a hard time getting along with anybody. The claimant said that he could not play around with people because doing so triggered him to become angry. The claimant recalled an argument with a coworker at his job at Pilgrim's Pride where he "ended up getting hit." He said he did not retaliate, was called a liar by his supervisor, and could not work under those conditions.

The claimant also said he had problems getting along with his family and that his fifteen-year-old child triggers him the most. Although the claimant testified that his wife does not trigger him "as much," she occasionally does trigger his anger. However, the claimant said he had no problems with his oldest and youngest child. (R. 55-56).

On a  typical day, the claimant said he hates waking up, hates going to bed, and "pray[s] every day that I die."  After he wakes up, he watches his four-year-old child because his wife works at night; watches television; and then cooks dinner for his wife. The claimant said he should clean and take care of the house during the day because his wife is the one working, but he does not because he is not motivated. The claimant also said he occasionally plays outside with his four-year-old daughter; takes her to the park; and takes her bowling with him on Monday nights. (R. 57).

The claimant testified that, even though he is on a bowling team, he usually does not have problems with others and views the time as a getaway for himself.  He said he previously had problems with other bowlers but solved the problem by leaving the league and finding another place to bowl. Also, the claimant said his depression or lack of desire caused him sometimes to miss bowling.  (R. 57-58).

The vocational expert Martha Daniel identified the claimant's past work as an equipment

cleaner, classified as unskilled, medium exertion work; a dietary aid, classified as unskilled, medium exertion work; a forklift operator, classified as unskilled, medium exertion work; a parts assembler, classified as semi-skilled, light exertion work; and a kitchen helper, classified as unskilled, medium exertion work.  (R. 63-64).

The ALJ posed a hypothetical question to Ms. Daniel involving an individual the same age, education, and work experience as the claimant who could understand, remember, and carry out short, simple instructions; can concentrate for two-hour periods to complete an eight-hour workday on short, simple tasks; occasionally can interact with the public, coworkers, and supervisors; and can adapt to infrequent, well-explained changes. Ms. Daniel said that such an individual could work as an equipment cleaner, forklift operator, parts assembler, and kitchen helper, and could also work in other occupations, such as a hand packager, which is an unskilled, medium level job with 210,000 jobs available nationally; a laundry worker, which is an unskilled, medium level job with 40,000 jobs available nationally; or a garment sorter, which is an unskilled, light level job with 50,000 jobs available nationally. (R. 64).

The ALJ posed a second hypothetical to Ms. Daniel involving an individual who could carry out simple and complex instructions; follow simple, work-like procedures; make simple, work-related decisions; sustain attention throughout extended periods of time, up to two hours at a time; perform at a consistent pace, particularly if he is engaged in at least a simple, or simple to semi-skilled detailed, but not complex task; maintain a regular schedule; work best in a setting that does not require sustaining general public contact; work in proximity with coworkers but not on joint or shared tasks; handle occasional supervisory contact; and work best in a structured environment with predictable work tasks and minimal social contact with others. Ms. Daniel said that such an individual could work in the claimant's previous job as an equipment cleaner, forklift operator, or parts assembler. Ms. Daniels said such an individual also could work in the three

additional occupations she mentioned when answering the first hypothetical. (R. 65-66).

Ms. Daniel further testified that, if such an individual were off-task 20% of the day or absent two days a month, no jobs would be available. The ALJ modified the second hypothetical by adding that the individual could have occasional conflicts with supervisors and coworkers one-third of the time.  Ms. Daniel said no jobs would be available under that hypothetical. (R. 67).

The claimant's counsel asked Ms. Daniel a hypothetical by adding, under either hypothetical, that the individual would occasionally inappropriately respond to the ordinary pressures of work. Ms. Daniel testified that such a restriction would eliminate all jobs.  (R. 68).

*The ALJ Decision*

On September 19, 2018, the ALJ issued a decision finding the claimant "not disabled." First, the ALJ found that the claimant had met the insured status requirements through June 30, 2018, and that the claimant had not engaged in any substantial gainful activity since the alleged onset date, April 1, 2015.

The ALJ found that the claimant had the severe impairment of "affective disorders." (R. 20).  But, the ALJ concluded that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. In making this finding, the ALJ found that, because the claimant's mental impairments did not cause at least one "extreme" or two "marked" limitations in the four broad areas of mental functioning, the "paragraph B" criteria were not satisfied. (R. 20-21).

The ALJ found that the claimant had mild limitations in his ability to understand, remember, or apply information because the claimant indicated that he could follow written and oral instructions well; play video games; and bowl in a bowling league. The ALJ also considered the claimant's mental status exams in the record that indicated his thinking was linear and goal-directed. (R. 21).

In finding that the claimant had moderate limitations in his ability to interact with others, the ALJ noted that the claimant lives with his wife and children; shops in stores for food and household items for one hour each week; and has never been fired or laid off from a job because of his inability to get along with others, although the claimant indicated he left before employers fired him. The ALJ also pointed to the claimant's mental status examinations suggesting the claimant was pleasant, easily engaged, and maintained good eye contact. (R. 21).

The ALJ found that the claimant was moderately limited in his ability to concentrate, persist, and maintain pace.  To support this finding, the ALJ noted that the claimant paid bills, handled a savings account, and used a checkbook; played video games; and bowled as part of a team. The ALJ also mentioned that the claimant's mental status exams indicated the claimant had linear and goal-directed thinking. (R. 21).

To support his finding that the claimant was only mildly limited in his ability to adapt or manage himself, the ALJ noted that the claimant was independent with personal needs; takes care of his child; cooks; cleans; does the laundry and takes out the garbage; drives places alone; shops in stores for food and household items for one hour each week; pays bills, handles a savings account, and uses a checkbook; plays video games; bowls weekly on a team; has a good attention span; follows written and oral instructions well; and has never been fired because he leaves before employers fire him. (R. 21).

The ALJ found that the claimant has the residual functional capacity to perform a full range of work at all exertional levels and can understand, remember, or carry out short, simple step instructions; can concentrate for two-hour periods to complete short, simple tasks in an eight-hour workday; can occasionally interact with the public, coworkers, and supervisors; and can adapt to infrequent, well-explained changes. (R. 27).

In making this finding, the ALJ considered the claimant's symptoms and the extent to

which these symptoms could reasonably be expected to be consistent with the objective medical evidence and other evidence in the record, based on the requirements of 20 C.F.R. § 404.1529 and SSR 16-3p. The ALJ also said she considered the opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of these symptoms were not fully consistent with the evidence. (R. 22, 24).

The ALJ recounted thoroughly the claimant's medical record and found that the claimant's daily living activities undermined his claim that he could not work full time.  Specifically, the ALJ cited that the claimant takes care of his four-year-old child all day by himself while his wife works; does the dishes; cooks; plays with his daughter outside; and takes his daughter to Monday night bowling with him where he bowls on a team. (R. 23-24).

The ALJ also referenced the claimant's own Function Report in which he states that he can pay attention for a long time; follow written and oral instructions well; get along with supervisors "pretty well"; is independent with his personal care needs; cooks; cleans; does the laundry; takes out the garbage; drives and goes out alone; shops in stores for food and household items once a week; pays the bills, handles a savings account, and uses a checkbook; and has dealt with bipolar disorder his whole life but did not seek help until April 2015. (R. 24).

Although she noted that the claimant does have limitations, the ALJ found that those limitations do not prevent the claimant from performing the range of work set forth in his RFC. The ALJ also considered the claimant's hospitalization for suicidal thoughts but noted that, following treatment, the claimant's symptoms improved, and the claimant said he was more stable than he had ever been in his entire adult life.

The ALJ also considered the long gaps in the claimant's treatment record and noted that

24

such gaps where the claimant did not seek treatment indicated that his medication controlled his condition when he took his medications.  The ALJ  pointed out that the claimant said that he was doing quite nicely in February 2016; that he was more stable than he had ever been in his entire adult life in April 2016; and that he reported no active issues in January 2017. (R. 24).

The ALJ did acknowledge the claimant's reports of moderate to severe symptoms in April 2018, but the ALJ noted that the claimant had not been taking his medications at that time.  The ALJ also noted that in July 2018 the claimant reported that his mood was "alright" and denied low energy, suicidal thoughts, obsessions, mania, paranoia, and memory deficiencies at that time.  (R. 24).

The ALJ noted that a review of the record as a whole showed no evidence of a disabling mental condition preventing the claimant from performing unskilled, entry-level jobs. The ALJ said the claimant received routine mental health therapy treatment and prescribed medications without any reported side effects. Also, the ALJ pointed out that, while the claimant was not sure if his medications were working, his wife said the medications worked. The ALJ also noted that, although the claimant had been hospitalized in the past for a short period of time, the claimant has not been admitted for crisis intervention or intensive health or behavioral therapy and that his activities of daily living do not reflect those of a totally disabled individual. (R. 24).

To support her findings, the ALJ also considered the medical source opinions in the record. She noted that no medical source opinion of record suggested that the claimant has limitations greater than those stated in the RFC and that no doctor indicated that the claimant could not work. (R. 24-25).

Regarding the opinion evidence, the ALJ gave considerable weight to Dr. Estock's opinion because it was not inconsistent with the claimant's RFC. The ALJ noted that Dr. Estock specializes in psychiatry, reviewed the medical evidence of record, and is familiar with the disability

program's Rules and Regulations. (R. 25).

The ALJ gave little weight to the opinion of Dr. Marinos that the claimant may have moderate difficulty with maintaining concentration over the course of a normal workday and moderate difficulty coping with stress in a job setting. The ALJ found "no evidence to support these limitations with maintaining concentration and getting along with others" and noted that the claimant himself reported that he could pay attention for a long time and dealt with authority figures pretty well.  The ALJ also pointed out that Dr. Marinos' examination notes indicated the claimant had appropriate concentration during his examination and that Dr. Marinos' limitations were based only on the claimant's subjective complaints and lacked objective support. (R. 25).

The ALJ considered the opinion of the claimant's friend Mr. Busby and gave it little weight because it was based on a casual observation and family loyalties as opposed to objective medical evidence and testing. (R. 25).

The ALJ concluded that the claimant's RFC was consistent with the medical source opinions, the claimant's testimony, and the medical record as a whole.  Based on the claimant's age, education, work experience, and RFC, the ALJ found that jobs exist in the significant numbers in the national economy that the claimant can perform.  The ALJ found that based on the vocational expert's testimony the claimant could perform his past relevant work as an equipment cleaner, forklift operator, parts assembler, and kitchen helper, and could also work as a hand packager, laundry worker, and garment sorter, all of which exist in significant numbers in the national economy. Thus, the ALJ found that the claimant was not disabled.

## VI.    DISCUSSION

The claimant argues that the ALJ did not properly credit his subjective complaints about the limiting effects of his mental impairments. This court disagrees.

The ALJ determined that the claimant had medically determinable mental impairments that

could reasonably be expected to cause the claimant's alleged symptoms, but the ALJ found that the claimant's subjective allegations regarding the severity, intensity, and limiting effects of those impairments were not supported by substantial evidence. (R. 24).  The ALJ properly articulated her reasons for this finding and substantial evidence supports them.

In evaluating the claimant's subjective symptoms, the ALJ recounted thoroughly the evidence in the record and considered all available evidence, including objective medical source opinions, the claimant's daily activities, and the effectiveness of his medications to alleviate the symptoms. *See* 20 C.F.R. § 404.1529(c)(3); SSR 16-3p (the ALJ must consider these things in making his determination regarding the claimant's subjective complaints).  The ALJ discussed evidence in the record that was both favorable and unfavorable to the claimant.  And the ALJ clearly articulated her reasons for finding that the claimant's subjective allegations about the limiting effects of his bipolar disorder were inconsistent with the record.  See *Taylor*, 2019 WL 581548, at *2 (quoting *Dyer*, 395 F.3d at 1210) (an ALJ must give clear, articulated reasons for his findings regarding the claimant's subjective complaints).

The ALJ pointed out that, although the claimant said he dealt with his bipolar disorder all of his life, he was employable for many years despite his affective disorder and did not seek any treatment for it until April 2015.  The ALJ also articulated that, after the claimant's 2015 hospitalization, mental health counseling, and medications, the claimant's symptoms improved; that the claimant indicated in 2016 that he was more stable than he had ever been in his adult life; that the gaps in the need for medical intervention in the record showed that his medications were controlling his condition; and that the claimant reported no active issues in 2017 and was stable.

The ALJ acknowledged the claimant's reports of moderate to severe symptoms in April 2018, but the ALJ noted that the claimant had not been taking his medications at that time.  Noncompliance with prescribed medication is a factor that the ALJ can consider in making her

findings.  *See* 20 C.F.R. § 404.1530 ("In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work.").  The ALJ also noted that in July 2018, the claimant reported that his mood was "alright" and denied low energy, suicidal thoughts, obsessions, mania, paranoia, and memory deficiencies.  (R. 24).

The ALJ also pointed to the claimant's daily activities and his own Function Report to support his finding regarding the claimant's subjective complaints.  The ALJ found the facts that the claimant was on a weekly bowling team, took care of his four-year-old daughter every day while his wife worked, drove places alone, went shopping for food and household items, payed bills, used a checkbook, and handled his savings account did not reflect someone who was totally disabled.  The ALJ also noted that the claimant, in his own Function Report, indicated that he could pay attention for a "long time"; could finish what he starts; could follow spoken and written instructions well; and gets along with authority figures "pretty well."  The ALJ's reliance on the claimant's daily activities and statements regarding his mental abilities constitutes substantial evidence to support her findings on this issue.

In addition to the claimant's daily activities and Function Report, the ALJ also relied on the medical source opinions in the record to support her findings regarding the claimant's subjection complaints and crafted a highly-restrictive RFC for the claimant based on those medical opinions. The ALJ correctly pointed out that no medical source opinion in the record showed that the claimant was more limited than what the ALJ accounted for in the claimant's residual functional capacity.[1]  In fact, although the ALJ gave little weight to Dr. Marinos' opinion regarding moderate

---

[1]  The court notes that, *after* the ALJ rendered his opinion, the claimant submitted to the Appeals Council the opinion of NP Sargent that the claimant met the criteria for long-term disability, but the Appeals Council found that opinion would not have changed the ALJ's decision and did not remand the case to the ALJ.  In claims like Mr. Lopez's that were filed before March 27, 2017, nurse practitioners are not considered acceptable medical sources.  *See* 20 C.F.R. § 404.1502.  And the claimant does not mention NP Sargent's opinion in his brief and does not raise an issue regarding the Appeals Council's treatment of that evidence. So, the court will not address that issue.

limitations in concentration and getting along with others, the ALJ herself found that the claimant had moderate limitations in his ability to concentrate, persist, and maintain pace and in his ability to interact with others. *See* (R. at 21).

And the ALJ accommodated Dr. Marinos' assessed limitations in the claimant's RFC by restricting the claimant to short, simple instructions, concentrating for two-hour periods, only occasional interactions with others, and the ability to adapt to infrequent, well explained changes. *See* (R. 22). Moreover, Dr. Estock's opinion regarding the claimant's mental limitations also supports the ALJ's findings regarding the claimant's mental limitations. So, the court finds that, based on the record as a whole, substantial evidence supports the ALJ's findings regarding the limiting effects of the claimant's mental symptoms. *See Meehan v. Comm'r of Soc. Sec.*, No. 18-14924, 2019 WL 2417642, at *3 (11th Cir. Jun. 10, 2019) (substantial evidence must support the ALJ's findings regarding the claimant's subjective complaints).

This court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer*, 395 F.3d at 1210. Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it. Ultimately, because substantial evidence supports the ALJ's conclusion that the claimant's subjective allegations about his mental limitations are inconsistent with the record as a whole, the ALJ did not commit reversible error.

**VII.   CONCLUSION**

For the foregoing reasons, the court concludes that the ALJ applied the proper legal standards and that substantial evidence supports her decision. The decision of the Commissioner should be AFFIRMED.

**DONE** and **ORDERED** this 24th day of February, 2021.

**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE